IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville January 28, 2014

**STATE OF TENNESSEE v. RICHARD DICKERSON**

**Appeal from the Criminal Court for Shelby County**
**No. 11-02622     Paula Skahan, Judge**

**No. W2012-02283-CCA-R3-CD  -  Filed March 19, 2014**

Richard Dickerson ("the Defendant") was convicted by a jury of second degree murder. The trial court sentenced the Defendant to twenty-five years' incarceration. In this direct appeal, the Defendant contends that the trial court (1) should have granted a mistrial following "jury misconduct"; (2) erred in admitting proof of prior bad acts; and (3) imposed an excessive sentence. After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

R. Todd Mosley (on appeal) and Robert Parris (at trial), Memphis, Tennessee, for the appellant, Richard Dickerson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Amy Weirich, District Attorney General; and Patience Branham and Doug Carriker, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

The Defendant was charged with committing the first degree premeditated murder of his girlfriend, Jacklyn Miller ("the victim"), in November 2010. At his sequestered jury trial, conducted in July 2012, the following proof was adduced:

Jacqueline Smith testified that she was the victim's mother. She last saw the victim on Wednesday, November 17, 2010. After this visit, Smith tried to contact the victim numerous times over the next several days via text messages and phone calls but got no response. Alarmed, she called the police department on that Friday and filed a missing persons report. She reported that the victim's boyfriend was Richard Dickerson. Some time later, the police called and informed her that the victim's body had been found. At the time, the victim's car was a green Mazda 626. The victim was twenty-one years old.

Sergeant Kathy L. Gooden of the Memphis Police Department ("MPD") missing persons bureau testified that she received a missing persons report from Jacqueline Smith in November 2010. In response to the report, she prepared a missing persons flyer including a photograph of the victim. She also called Richard Dickerson, reported as the victim's boyfriend, to inquire if he had heard from the victim. She identified the Defendant at trial as Dickerson. The Defendant told her that the victim had spent the night of Monday, November 15, 2010, with him and that the last time he saw her was the next morning when she left. Sgt. Gooden learned that the victim had not reported to work on that Thursday and Friday.

When Sgt. Gooden called the Defendant a second time to inquire if he had heard from the victim, the Defendant reiterated that the last time he saw the victim was on that Tuesday morning. He added that the victim called him the next afternoon, Wednesday, November 17, 2010, at about 4:00 p.m.

After receiving a tip from Crime Stoppers, Sgt. Gooden and two other officers went to the Defendant's residence to speak with him in person. The Defendant then admitted that the victim "had previously gotten an order of protection on him on a domestic violence assault." The Defendant also stated that he had contacted the victim's aunt because he "had had a gut feeling that something had happened to" the victim. Sgt. Gooden later confirmed that there had been a previous domestic violence complaint.

On cross-examination, Sgt. Gooden acknowledged that she investigated several persons as possibly responsible for the victim's disappearance.

On redirect examination, Sgt. Gooden stated that one of the tips she got through Crime Stoppers was that the victim's body would be found in the trunk of her car at the Willow Creek Apartments. A Crime Stoppers tip also claimed that the Defendant had killed the victim. She gave this information to the homicide department.

LaDonna Garfield, the victim's aunt, testified that she and the victim had been close. She identified the Defendant as the victim's ex-boyfriend, explaining that "they had broke

2

up." On Wednesday evening, November 17, 2010, the Defendant called and told her that he thought something had happened to the victim. The conversation was short because Garfield had to go to work. The next morning, the Defendant called again, repeating that he thought something had happened to the victim. Garfield spoke with him several more times over the phone that day and the next day after the missing persons report was filed. The Defendant continued to call her over the next several days "on up until the day he was arrested." His calls focused on his concerns over the victim.

Garfield testified that, on February 22, 2010, the victim had been living with Garfield's parents on Cedarwoods Cove. Garfield was in bed in the front bedroom when she heard a scream. When she got up to investigate, the victim walked past her "crying and upset." The victim went into the bathroom and locked the door. Garfield went to the carport door where her father was and looked out. She saw the Defendant in the Defendant's mother's car. She returned to the victim, who came out of the bathroom and sat down on the couch in the den. Garfield described the victim's appearance as disheveled. Garfield kept asking the victim what had happened, and the victim told her that she had gotten into an altercation with the Defendant at the Defendant's house. When the victim left in her car, the Defendant followed her. The victim drove to Cedarwoods Cove and, as she was trying to get in the house, the Defendant approached her and kept trying to talk to her. The victim told him she did not want to have anything more to do with him. The Defendant told her that he would leave, but first he wanted her to give him a hug. The victim told Garfield that, when she told him no, "he grabbed her and started choking her and she's trying to get away and he slammed her down on the concrete."

On cross-examination, Garfield stated that the last time she saw the victim and the Defendant together was in July 2010.

Britney Harrell, ex-girlfriend of the Defendant's friend Rodricus Shaw, testified that, while she was talking on the phone with Shaw, she overheard the Defendant "saying that he didn't mean to kill her." She stated that she was familiar with the Defendant's voice. The following week, she overheard a phone conversation between Shaw and the Defendant while Shaw's phone was in speaker-phone mode. She heard the Defendant say that he had killed "her," put her body in the car, and then drove the car to some apartments in east Memphis. She reported this information to the police. She later gave a statement to the police and identified the Defendant in a photographic array. Underneath his photograph, she wrote, "This is Richard Dickerson who killed Jacklyn Miller."

Vincent Ingram testified that he and the Defendant had been friends since childhood. In November 2010, he lived around the corner from the Defendant. One day, the Defendant told him that he, the Defendant, thought that the victim was "setting him up" because he had

found some text messages on her phone giving "some guy" the directions to the Defendant's house. The Defendant told Ingram that he was going to talk to the victim about it and that she was on her way over. Later, Ingram saw the victim getting out of her car in front of the Defendant's house. Later that night, the Defendant came over to Ingram's house, woke Ingram up, and told Ingram that he thought he had killed the victim. The Defendant told Ingram that he had strangled the victim and that she was not moving. The Defendant then left. Sometime in the next day or two, Ingram and Shaw were at the Defendant's house. Ingram overheard the Defendant tell Shaw that he, the Defendant, had killed the victim and put her body in the trunk of her car.

Subsequently, Ingram identified the Defendant from a photographic array. On the array he wrote, "This is Richard. He told me him and Jacky had a fight which led to him choking her to death."

On cross-examination, Ingram stated that, when the Defendant first told him about what he had done, the Defendant "was kind of shaken up a whole lot." Ingram had no doubt that the Defendant loved the victim, and the Defendant expressed remorse about what he had done.

Craig Holmes testified that he was the Defendant's cellmate in December 2010. The Defendant told him that he had strangled his girlfriend.

Fred Anderson testified that he was a "courtesy officer" at Willow Creek Apartments in November 2010. His job was to patrol and make sure that nothing was out of the ordinary. Anderson stated that the first time he saw the victim's Mazda was on November 17, 2010. He noticed the victim's Mazda because he had not seen that car before. When he first saw the Mazda, he noticed "a black male walking away from the car." He had not seen that person before, but he got a good look at him. Anderson identified the Defendant as the black male he saw.

Anderson testified that, after he made a full circle around the parking complex, he saw that the Mazda had been moved and "backed in." He reported what he had seen to his supervisor.

Anderson continued to see the car in the parking lot for one week. It stayed in the same place during this time. He explained that he was away at his other job when the police came to get the car.

On cross-examination, Anderson clarified that it was between 2:00 p.m. and 3:00 p.m. when he first saw the Mazda. The next time he saw it was about four to five minutes later.

4

Officer Russell Mooney of the MPD testified that he responded to an apartment complex after receiving a report about the victim's car. After locating the car, he notified his lieutenant. Officer Mooney described the car's location as "backed in against the fence." He remained on the scene until the car was towed. No one opened the car or inventoried it prior to its being towed away.

Officer Dewayne Johnson, a crime scene investigator with the MPD, responded to the Willow Tree Apartments on November 23, 2010, regarding a car found there that belonged to a missing person. After photographs were taken of the scene, he followed the car as it was towed to the Crime Scene Office ("CSO"). The car was not opened prior to its arriving at the CSO. After the vehicle was positioned in the CSO, Officer Johnson processed its exterior for fingerprints. He did not find any fingerprints. Officer Johnson then used an entry tool on the locked car to open the door. Officer Johnson took photographs of the car's interior and swabbed for DNA. When officers finished searching the interior of the car, they opened the trunk and found the victim's body.

On cross-examination, Officer Johnson stated that he dusted the inside of the car for fingerprints but did not recover any.

Officer Kevin Lundy, a homicide investigator with the MPD, responded to the victim's car at the CSO. He identified photographs taken of the victim's body in the trunk of her car. He stated that, although the victim was clothed, her clothing was disheveled. The victim's bra was twisted and above her breasts, her panties were around her thighs, and her pants were unzipped and down around her hips. There was a rope around the victim's neck.

On further investigation, Officer Lundy learned that the Defendant had been the last person known to have seen the victim. Officer Lundy prepared a photographic array with the Defendant's photograph and showed the array to Anderson on November 24, 2010. Anderson identified the Defendant's photograph as the man he had seen near the victim's car in the apartment complex parking lot.

Officer Lundy obtained a search warrant for the Defendant's residence. In the garage, he found some rope hanging on the wall. The rope was photographed, collected, and transmitted to the Tennessee Bureau of Investigation ("TBI"). Law enforcement also collected a DNA sample from the Defendant with the Defendant's consent.

Donna Nelson, a special agent forensic scientist with the serology DNA unit at the Memphis Regional Crime Laboratory, testified that blood located on underwear recovered from the victim's body matched the Defendant's DNA.

5

Special Agent Linda Littlejohn of the TBI Crime Laboratory testified that she performed fiber comparisons. She analyzed the rope recovered from the victim's body and the rope recovered from the Defendant's residence. She testified that the two ropes did not match.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, testified that she performed an autopsy on the victim on November 24, 2010. She determined the cause of death to be "asphyxiation due to ligature strangulation." Dr. Chancellor explained that, although it took two to three minutes to accomplish an individual's death by strangulation, the individual would lose consciousness in less than ten seconds.

Officer Darnell Bridgeforth, Jr., of the MPD testified that he responded to the Cedarwoods Cove address on February 22, 2010, on a domestic assault call. He spoke with the black female victim who stated that she had been assaulted by her boyfriend. Officer Bridgeforth described the victim's demeanor as "distraught" and added that her hair was "messed up." She advised him that her boyfriend was Richard Dickerson. After reviewing his report, he identified the victim as the victim in this case.

Barbara Scott, an employee of the Hair Design School in Memphis, testified that the victim was one of her students. The Defendant was also one of her students. She testified that the victim and the Defendant met at the school and began dating. Scott stated that, in late February 2010, she noticed bruises around the victim's neck. The victim did not tell her how she got the bruises.

Monica Parker testified that she went to "hair school" with the victim and that they had been friends. She also knew the Defendant from school. Beginning in August 2010, the victim stayed with Parker at Parker's apartment two or three nights a week. On one occasion after the victim began staying with her, the Defendant called Parker and told her that the victim was on her way to Parker's apartment "and that she might be crying." When Parker asked the Defendant why the victim might be crying, he told her that he spit on her. When the victim arrived, the victim told Parker that the Defendant had bitten her. The victim showed Parker what appeared to be a bite mark on the victim's cheek.

On cross-examination, Parker explained that, when the victim was not spending the night at Parker's apartment, the victim was with either her grandmother or with the Defendant. At one point, the victim's grandmother "put her out" because the victim had resumed her relationship with the Defendant. Parker stated that the bite mark was not bleeding when she observed it. During her phone call with the Defendant, the Defendant told her that he had not meant to hurt the victim.

6

The Defendant testified that he was responsible for the victim's death. He explained that she came over to his house and that they started to have sex. They stopped, however, because the victim wanted to talk to him. They got into an argument. The victim "start[ed] swinging." He told her to stop, but, he testified,

> She kept swinging. I grabbed her told her to stop. She kept on and I like was choking her but I wasn't trying to – I wasn't trying to harm her. I wasn't trying to kill her and like I put her on the floor and got on top of her and told her to stop swinging at me and she kept on doing that and she just stopped. She stopped. After I noticed she done closed her eyes, I panicked. I wanted to call the police but I was scared.

When the Defendant realized that the victim was dead, he put her clothes on her body and put her body in the trunk of her car and drove to some nearby apartments.

Asked about the rope around the victim's neck, the Defendant answered,

> We already had some rope in that trunk of that car and it was like a small portion of it. I didn't want to put the rope around her neck but like I got scared just – I just tied it around her neck because I don't know if I was driving the car or she would just wake up or what. I didn't know what would happen. I don't know. I didn't put it on there tight. I just wrapped it around there and like cut the ends up off of it.

The Defendant denied that he planned or expected to kill the victim.

In rebuttal, the State re-called Monica Parker. Parker testified that she never saw the victim scream at anyone or hit anyone. She testified about an occasion at "hair school" when she was talking to the victim on the phone and, when the Defendant realized she was speaking with the victim, the Defendant "went off" on her (Parker), "yelling and screaming" at her.

The State also re-called Barbara Scott, who described the victim as "a very loving, caring, happy little girl that had been sheltered." Scott described the Defendant as "a young man that was very angry and violent." She explained that he had been subject to discipline at the hair school for "outbursts or cursing."

After considering this proof, the jury convicted the Defendant of the lesser-included offense of second degree murder. After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to the maximum term of twenty-five years' incarceration.

7

In this appeal, the Defendant contends that the trial court should have granted a mistrial following "jury misconduct"; that the trial court erred in admitting proof of the Defendant's prior bad acts; and that his sentence is excessive. We will review each of these issues in turn.

## Analysis

### *Juror Misconduct*

During the State's case-in-chief, one of the court officers informed the trial court that he had heard a report from Juror Towns that another juror knew one of the Defendant's cousins. To address this matter, the trial court initially called into the courtroom Juror Clayton, the juror who allegedly knew the Defendant's cousin. The trial court asked Juror Clayton if she knew a member of the Defendant's family, and Juror Clayton replied, "Not that I'm aware of." Juror Clayton also denied telling anyone that she knew a member of the Defendant's family. The trial court then instructed Juror Clayton to be seated in a separate room away from the other jurors.

The trial court then called into the courtroom Juror Johnson, Juror Clayton's roommate.[1] The trial court asked Juror Johnson if Juror Clayton had made "any kind of statement to [her] about [the Defendant] or his family?" Juror Johnson replied, "Not that I know of." She then clarified that, before the jury was selected and while they were all in the lobby, Juror Clayton said that she had seen "somebody's cousin" and had given him a hug. Juror Johnson stated that she did not know whose cousin this person was. Juror Johnson denied that she had told this to anyone else on the jury. The trial judge then informed Juror Johnson that she was considering "letting [Juror] Clayton leave" and asked if Juror Johnson could "still be fair and impartial?" Juror Johnson answered affirmatively. The trial court then returned Juror Johnson to the room in which the rest of the jury was waiting.

The trial court then called into the courtroom Juror Hammond, who told the trial court, "I think [it] was relayed to me yesterday during conversation with [Juror Johnson] that [Juror Clayton] is a friend of a cousin of [the Defendant's]." Juror Johnson also told Juror Hammond that Juror Clayton "didn't really want to be here." When the trial court asked Juror Hammond if she (Juror Hammond) had relayed this conversation to anyone else, she answered that she had mentioned it to Jurors Holliday and Towns. Asked about the impact of this information on her ability to be fair and impartial, Juror Hammond replied, "It doesn't really affect me other than the fact that you know I know that there is some dishonesty based on [Juror Clayton] but I mean as far as what the trial is about and the defendant I have no problem with that." The trial court then returned Juror Hammond to the room with the rest

---

[1] The jury in this case was sequestered, and the two jurors shared a hotel room.

of the jury. The trial judge also stated on the record that she put Juror Johnson in the separate room with Juror Clayton[2] and that "[r]ight now they're both going to be our alternates and leaving."

The trial court then called Juror Towns into the courtroom and asked her "about any conversations about someone who might have known [the Defendant] or a member of his family." Juror Towns responded that Juror Hammond had told her the day before that Juror Johnson had told Juror Hammond that Juror Clayton was "friends with" the Defendant's cousin. Juror Towns determined that this information needed to be disclosed and so informed the court officer. Juror Towns denied that she had discussed this with anyone else on the jury. Juror Towns was then returned to the rest of the jury.

The trial court then called Juror Holliday into the courtroom and inquired into this matter. Juror Holliday stated that Juror Hammond had told her that Juror Johnson had said that Juror Clayton knew someone in the Defendant's family. Juror Holliday stated that this information would not affect her ability to be fair and impartial. Juror Holliday then returned to the jury.

Juror Towns then was returned to the courtroom and the trial court inquired whether "this incident" would affect her ability to be fair and impartial, to which Juror Towns replied, "No."

The defense asked for a mistrial, and the trial court denied the defense's motion.

The record then reflects that, contrary to the trial court's instruction, Jurors Clayton and Johnson had been returned to the main jury room with the rest of the jurors. The defense renewed its motion for a mistrial. The trial court denied the motion and instructed the jury as follows:

> For the record Kendra Clayton and Denise Johnson have been excused from the jury panel. The reasons for that are not relevant for your consideration. Okay. And we're going to move forward with the trial.

The State then resumed its presentation of proof.

During the lunch break, the trial court put the court officer on the witness stand and established that Juror Clayton had been isolated from the jury but that Juror Johnson had not been isolated. The court officer stated that he had not been "able to hear whether they were

---

[2] We acknowledge this statement conflicts with other information reflected earlier in the record.

discussing things back there." After the jury was returned to the courtroom, the trial court inquired of each juror whether there had been any discussion with Juror Johnson about what had occurred. Each juror responded that there had been no discussion and affirmed that he or she would be able to continue as a fair and impartial juror.

The Defendant now contends that the trial court should have granted a mistrial because Juror Clayton knew a member of the Defendant's family and had contact with that family member "during the trial." Moreover, he argues, "[s]ome of this information was shared with at least four other jurors." The Defendant asserts that the jury was thereby exposed to an improper outside influence and that the State failed to rebut the presumption of prejudice.

Every criminal defendant is entitled by both the federal and Tennessee constitutions to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I §9; see also State v. Adams, 405 S.W.3d 641, 650 (Tenn. 2013). "Jurors must render their verdict based only upon the evidence introduced at trial." Adams, 405 S.W.3d at 650. "When a jury has been subjected to either extraneous prejudicial information or an improper outside influence, the validity of the verdict is questionable." Id.

> [E]xtraneous prejudicial information is information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case. An improper outside influence is any unauthorized "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury."

Id. at 650-51 (quoting Remmer v. United States, 347 U.S. 227, 229 (1954)) (other citations omitted).

A defendant challenging the validity of a verdict on the basis of a tainted jury "must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." Id. at 651. In this case, the proof established that several of the jurors had been informed that another juror knew one of the Defendant's family members.

Initially, we note that, contrary to the Defendant's assertion in his brief, the record does not reflect that "Juror Clayton had contact with a member of the Defendant's family *during the trial*." (Emphasis added). Rather, Juror Johnson stated that, prior to the jury's being selected, she had seen Juror Clayton give someone a hug in the courthouse lobby. Although Juror Clayton denied knowing anyone related to the Defendant and Juror Johnson denied knowing whose cousin Juror Clayton had hugged, the other interviewed jurors each

10

explained that they had heard that Juror Clayton knew one of the Defendant's cousins. Accordingly, we acknowledge that, during the trial, several jurors were told that Juror Clayton knew one of the Defendant's family members.

However, we fail to discern how a report that a juror is acquainted with a defendant's family member is, in and of itself, either extraneous prejudicial information or an improper outside influence. The "fact" of Juror Clayton's alleged relationship – a relationship she denied – did not "bear[] on a fact at issue in the case." Id. at 650. Moreover, there is no indication whatsoever in the record that the alleged cousin said anything to Juror Clayton. Thus, there is no evidence in the record that the alleged pre-trial contact between Juror Clayton and a member of the Defendant's family included "either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case" or that the alleged cousin delivered to Juror Clayton any "private communication . . . about the matter pending before the jury." Id. at 650-51. Additionally, there is no indication whatsoever in the record that Juror Clayton told any other jurors that her alleged relationship with one of the Defendant's cousins would or should have an impact on the jury's deliberations. Nor does the record indicate that Juror Clayton told any other jurors any information about the Defendant. Cf. Briggs v. State, 338 S.W.2d 625, 626-28 (Tenn. 1960) (reversing defendant's conviction because, during deliberations, a juror who was one of the defendant's neighbors told the other jurors that the defendant "had a bad temper and would kill you if he got mad, and that he had killed his brother").

While we agree with the trial court's decision to exclude Juror Clayton from the jury because of her alleged relationship with a member of the Defendant's family, we do not agree that the simple disclosure of this alleged relationship to other jurors so tainted the jury as to entitle the Defendant to a new trial.[3] Accordingly, we hold that the Defendant is entitled to no relief on this basis.

*Prior Bad Acts*

The Defendant contends that the trial court committed reversible error in allowing the State to adduce proof that the Defendant previously had choked the victim on one occasion and previously had bitten her on another occasion. The State responds that the trial court did not err in admitting this evidence.

---

[3] We also agree that the trial court's exclusion of Juror Johnson was appropriate given Juror Johnson's inappropriate communications to other jurors. If Juror Johnson had concerns about Juror Clayton, the only person she should have informed was the court officer.

11

Tennessee Rule of Evidence 404(b) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The effect of this provision is that, "[a]s a general rule, evidence of a defendant's character is inadmissible for the purpose of proving his or her propensity to commit crime." W. Mark Ward, Tennessee Criminal Trial Practice § 22.22, at 624 (2010-2011 ed.). Importantly, however, Rule 404(b) permits the admission of proof of other acts "for other purposes." Tenn. R. Evid. 404(b). Other purposes for which "other acts" evidence may be admissible include identity, intent, and motive. Tenn. R. Evid. 404, Advisory Comm'n Cmts; State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). When the trial court substantially has complied with Rule 404(b)'s procedural requirements, we will reverse its decision to admit evidence under Rule 404(b) only upon an abuse of discretion. State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008).

In this case, the trial court conducted the requisite hearing during which the State adduced proof that the Defendant had choked the victim in February 2010 and that the Defendant had bitten the victim sometime in August 2010 or thereafter. The State argued that the evidence went "to the nature of the relationship and intent to harm a particular victim as well as a motive for a killing because of the volatile nature of their relationship." The trial court ruled that the choking incident "goes to show in this case [the Defendant's] clear intent to do harm to [the victim]." The trial court also stated that strangling was "a very unique way

12

of doing harm to an individual," rendering the proof probative of the perpetrator's identity.[4] The trial court determined that the probative value of this proof was not outweighed by the danger of unfair prejudice. As to the proof of the Defendant's biting the victim, the trial court ruled that this proof was also indicative of the Defendant's intent to harm the victim and was also a unique method of inflicting harm. The court ruled that the probative value of this proof was not outweighed by the danger of unfair prejudice. The Defendant argues that the trial court erred because the choking and biting incidents were too far removed from the date of the murder to be indicative of the Defendant's intent at the time he killed the victim.

We agree with the Defendant that the trial court erred in the exercise of its discretion when it allowed the State to adduce proof that the Defendant had choked the victim in February 2010. This Court has recognized the prejudicial impact of proof of a prior act that is very similar to the act for which the defendant is being tried. See McCary, 119 S.W.3d at 243 (noting that, "[i]n those instances where the prior conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases") (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)); see also Adams, 405 S.W.3d at 659 (recognizing that, "in those instances where the prior conduct or acts are similar to the crimes on trial, the danger of unfair prejudice increases") (citing State v. James, 81 S.W.3d 751, 762 (Tenn. 2002)); State v. Rodriguez, 254 S.W.3d 361, 376 (Tenn. 2008) (quoting State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)). Moreover, the many months that had elapsed between the February assault and the November killing diluted significantly the probative value of this proof on the Defendant's state of mind at the time he killed the victim. See State v. Elkins, 102 S.W.3d 578, 584 (Tenn. 2003) ("In determining whether to allow the admission of evidence of [other] crimes, wrongs, or acts in a given case, trial courts should be mindful of the similarity of the offenses or acts and the proximity of time."). Because of the highly prejudicial nature of this proof and its minimal probative value, the trial court erred in ruling it admissible.

Nevertheless, the trial court's error in this regard was harmless. The Defendant admitted to having strangled the victim to death. The jury rejected the State's argument that the Defendant intended to kill the victim because it convicted the Defendant of second degree murder rather than first degree premeditated murder. While first degree premeditated murder requires that the accused intended to kill the victim, see Tenn. Code Ann. § 39-13-202(a)(1) (2010), a second degree murder requires only that the accused acted with a knowing state of mind. See id. § 39-13-210(a)(1) (2010). Accordingly, we hold that the trial court's error in

---

[4] Our research reveals that Tennessee's appellate courts considered at least twelve cases in 2013 alone that dealt with accomplished or attempted strangulations. We, therefore, respectfully disagree with the trial court that strangling someone is a "unique way of doing harm" in Tennessee.

admitting proof that the Defendant previously had choked the victim did not prejudice the verdict. See Tenn. R. App. P. 36(b); Rodriguez, 254 S.W.3d at 371-72. The Defendant is entitled to no relief on this basis.

Admission of proof about the prior biting incident presents a much closer question. For the same reasons, however, we hold that any error by the trial court in allowing the State to adduce proof that the Defendant previously had bitten the victim was harmless and does not entitle the Defendant to relief.

*Sentencing*

After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to the maximum term of twenty-five years in the Tennessee Department of Correction. The trial court considered the following three enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; the Defendant treated the victim with exceptional cruelty during the commission of the offense; and the Defendant violated a court order when he killed the victim. See Tenn. Code Ann. § 40-35-114(1), (5), (13) (2010). As to this third factor, the trial court referred to the agreed order of protection that had been entered in the General Sessions Criminal Court of Shelby County, Tennessee, on March 9, 2010, in which the victim was the petitioner and the Defendant was the respondent. This order ordered the Defendant "to refrain from telephoning, contacting, or otherwise communicating with [the victim], directly or indirectly, or coming about [the victim] or [the victim's] residence or place of employment for any purpose." The Defendant contends that the trial court erred in considering these latter two enhancement factors.

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

15

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We agree with the Defendant that, in enhancing his sentence, the trial court should not have considered the factor that he treated the victim with exceptional cruelty while strangling her to death. The trial court considered this factor on the basis that the victim was aware of the Defendant's "squeezing the life out of her for two to three minutes." However, while we certainly agree that the Defendant committed a heinous and reprehensible act in killing the victim, the medical proof established that the victim would have lost consciousness in less than ten seconds after the Defendant began strangling her. Accordingly, the trial court should not have considered this factor.

We also agree with the Defendant that the trial court should not have considered enhancement factor (13). This factor provides as follows:

At the time the felony was committed, one (1) of the following classifications was applicable to the defendant:

(A) Released on bail or pretrial release, if the defendant is ultimately convicted of the prior misdemeanor or felony;

16

(B) Released on parole;

(C) Released on probation;

(D) On work release;

(E) On community corrections;

(F) On some form of judicially ordered release;

(G) On any other type of release into the community under the direct or indirect supervision of any state or local governmental authority or a private entity contracting with the state or a local government;

(H) On escape status; or

(I) Incarcerated in any penal institution on a misdemeanor or felony charge or a misdemeanor or felony conviction[.]

Tenn. Code Ann. § 40-35-114(13). We are aware of no case law equating an agreed order of protection to being on some form of "release." Moreover, there is no provision in this factor for enhancement on the basis of a violation of a protection order. Accordingly, the trial court should not have considered this factor.

Nevertheless, the trial court properly considered enhancing the Defendant's sentence on the basis of previous criminal behavior, and the Defendant does not contend otherwise. The record also demonstrates that, other than improperly considering two enhancement factors, the trial court sentenced the Defendant in accordance with our Sentencing Act. A trial court's erroneous consideration of some enhancement factors, which are merely advisory, does not give this Court grounds for reversal when the trial court otherwise conforms with the mandates of the Sentencing Act. See Bise, 380 S.W.3d at 709-10; Carter, 254 S.W.3d at 346. Accordingly, the Defendant is not entitled to relief on this basis.

## CONCLUSION

The Defendant has not demonstrated that he is entitled to a new trial or other relief. Accordingly, we affirm the trial court's judgment.

_____
JEFFREY S. BIVINS, JUDGE

17